420 So.2d 229 (1982)
Kenneth William WHEAT
v.
STATE of Mississippi.
No. 52780.
Supreme Court of Mississippi.
October 6, 1982.
*230 Earl B. Stegall, John F. Hester, Gulfport, Cleve McDowell, Drew, for appellant. (Attorneys have withdrawn from case.)
Bill Allain, Atty. Gen. by Marvin L. White, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before the Court En Banc.
BOWLING, Justice, for the Court:
Appellant Kenneth William Wheat was indicted for the crime of capital murder of Joseph M. Mayer while attempting to commit the crime of robbery by the Grand Jury of the First Judicial District of Harrison County. He received a bifurcated trial before the same jury as authorized by statute and the former decisions of this Court. After the first stage of the trial, the jury returned a verdict finding appellant guilty of capital murder. After the sentencing stage of the trial, the jury returned a verdict sentencing appellant to death. This appeal follows in accordance with Mississippi Code Annotated, Section 99-19-105 (Supp. 1981).
At the outset, we recognize that in this opinion it shall be necessary to refer to another indictment and conviction of appellant for the alleged capital murder of Teresa C. Hayes Mayer, wife of Joseph M. Mayer. In that cause appellant was found guilty of capital murder by the jury, but the same jury was unable to agree on a sentence; after which the trial court sentenced appellant to life under the supervision of the Mississippi Department of Corrections. The Harrison County Circuit Court docket number of the cause involving the death of Mrs. Mayer was Number 17,101 and the present cause in the lower court was Number 17,102. Appellant interjected preliminary motions before the first trial for the death of Mrs. Mayer, which motions were filed in both causes as one motion, bearing both docket numbers, and heard by the lower court prior to the first trial. It, therefore, is necessary to refer to the first trial for specific purposes brought out in the present appeal.
On July 28, 1979, two young people, Joseph M. Mayer and Teresa Carol Hayes, were married in Paducah, Kentucky, the home of the couple and their families. After the marriage, they left on their honeymoon to the Mississippi Gulf Coast, intending to spend the first night in Memphis, Tennessee, which they did. The parents were called at about 9:20 that evening from a motel in Memphis. The next that was *231 heard from the young married couple was on the evening of Sunday, July 29, 1979, when Joseph M. Mayer called his father at 9 p.m. from a pay station immediately outside the Worth Motel on the beach at Gulfport in the First Judicial District of Harrison County. Young Mayer talked with his father for twenty minutes. After completion of this conversation the young couple were not heard of again until their bodies were found on July 31, 1979, in a wooded area north of Gulfport. Their hands and feet were tied behind them and each was shot in the back of the head.
The Mayers left Kentucky on their honeymoon in a 1976 Cutlass automobile owned by young Mayer. The car had attached to it a Kentucky license plate. Shortly after publicity was circulated regarding the finding of the bodies and a description of the car, four people who lived near the place where the bodies were found reported to the sheriff's office that they had had an experience with a man driving a car of that description near their home at about midnight on the night of Sunday, July 29. In the home lived Mr. and Mrs. Algie Netto and Mrs. Netto's two sons, Gary Wayne Walker and Eugene Walker, ages 26 and 27. Around midnight or a little after, a man knocked on the door of the residence and upon being admitted, stated his car had run into a ditch a short distance down the road and asked for assistance in getting it back onto the roadway. The two Walker brothers drove the man back to the place where the car was stuck in their vehicle. They found that one of the car's tires was flat. The spare tire was exchanged for the flat tire, and the Walker brothers attempted to get the car back on the roadway but were unable to do so. They then went back to the residence to secure the help of their step-father, Algie Netto. The latter drove his tractor to the scene and was able to pull the car back on the roadway. The driver of the car then drove to the Netto residence and stayed there for a period of time drinking ice water and talking. He then left in the Cutlass with the Kentucky license plate.
The Walker brothers testified that during the ride from their residence to the Cutlass car, the car's driver sat between them in the pickup truck. They testified that they were able to observe him fully. They also testified they were able to observe him fully at the scene, as their vehicle's lights were left on for assistance in working on the Cutlass. Mr. and Mrs. Netto and the Walker brothers stated that they had ample opportunity to see the driver of the car fully while he was at their residence drinking water.
A description of the man in the Cutlass was given to the artist connected with the sheriff's department. From these descriptions a composite sketch of the man was made and immediately circulated. Shortly thereafter Deputy Sheriff Harold Lloyd Wheat [no relation to appellant] of adjoining Pearl River County, contacted the Harrison County Sheriff's Department and advised that the composite sketch resembled appellant, who was reared in that county, but had been away from the state for a number of years.
On October 19, 1979, appellant was arrested in Orlando, Florida, and later returned to Harrison County, Mississippi, under the charges of murdering the Mayers. In the meantime, subsequent to the completion of the official investigation, appellant was indicted on September 28, 1979, by the Harrison County Grand Jury.
As hereinbefore stated, appellant was first tried in December 1979, for the alleged capital murder of Mrs. Mayer. The trial of the cause sub judice began on January 14, 1980, and ended on January 18, 1980. At the trial, Mr. and Mrs. Netto and Gary and Eugene Walker positively identified appellant as the man who was driving the Mayer's car at about midnight on the night the Mayers were last heard from at approximately 9:30 p.m. They described his appearance in detail, including his clothing. They positively identified a photograph of the Mayer car as the one occupied and driven solely by appellant on the night the Mayers met their death. A cashier at a local restaurant near the Worth Motel testified from photographs that the Mayers *232 came in for dinner about 6:30 p.m. on Sunday, July 29, and were there about one or one and a half hours. She testified that they were alone during the entire time.
A relative of appellant testified that he had known appellant all his life, and in March 1979, he was called by appellant to come and get him at a bar in Harrison County. Appellant according to the relative had been gone from the State of Mississippi about nineteen years and talked with an accent he did not have when he left the state. [The Nettos and Walkers also testified appellant talked with an accent on the night the Mayers met their death.] The relative testified that from March 1979 until about the time of the Mayers' deaths, appellant stayed at either his house or the house of another relative. He never saw appellant after the Mayers were found dead. He testified that during the time appellant was staying at his house or the other relatives' house, appellant had a Vandyke beard. [The Nettos and Walkers testified appellant had a Vandyke beard.] Another relative Dwayne Wheat testified that he went with appellant to the County Courthouse and helped him secure a driver's license. He testified the last time he saw appellant was about July 28, 1979.
Linda Perry, daughter of Earl Wheat and cousin of appellant, testified she last saw appellant on Saturday, July 28, 1979.
Testimony was admitted from Al Winchell, jailor with the Harrison County Sheriff's Department. He testified on November 29, 1979, appellant called him to his cell and gave him a sealed envelope addressed to Jim Kelly, head jailor, which Winchell immediately gave to Kelly. This note was introduced in evidence and read: "Notify my lawyer and Sheriff Hobbs that I want to plead guilty to the Mayer murder charges tomorrow and I want to be sentenced next week. Kenneth Wheat. 11-29-79." Mr. Kelly immediately notified the sheriff and appellant's attorney. Later the same day, Wheat gave the jailors another hand written note stating that he was innocent of the Mayer murders, but in order to spare himself and his family the suffering, he was pleading guilty. He headed this note "Press Release."
Orlando Florida Police Officer Stephen Finkel testified that upon the arrest of appellant, he first gave a fictitious name but later admitted he was Kenneth Wheat and was wanted for murder in Mississippi.
Appellant propounds five assignments of error in this appeal:
I. THE COURT ERRED WHEN IT FAILED TO REQUIRE THE DEFENDANT TO UNDERGO A MENTAL EXAMINATION TO DETERMINE HIS COMPETENCE TO STAND TRIAL, AND HIS COMPETENCY AT THE TIME OF THE COMMISSION OF THE ALLEGED OFFENSE.
II. THE COURT ERRED WHEN IT FAILED TO DIRECT A VERDICT FOR THE DEFENDANT AT THE CLOSE OF THE STATE'S CASE AS TO THE CRIME OF CAPITAL MURDER.
III. THE COURT ERRED WHEN IT FAILED TO INSTRUCT THE JURY AS TO LESSER INCLUDED OFFENSES OTHER THAN CAPITAL MURDER, AND IN FAILING TO ALLOW THE JURY TO CONSIDER LESSER INCLUDED OFFENSES OTHER THAN CAPITAL MURDER.
IV. THE COURT ERRED WHEN IT ALLOWED THE JURY TO CONSIDER THE DEATH PENALTY FOR THE DEFENDANT, IT SHOULD HAVE DIRECTED A VERDICT AS TO SENTENCE, AND SHOULD HAVE SENTENCED THE DEFENDANT TO LIFE IMPRISONMENT.
V. THE COURT ERRED WHEN IT INCORPORATED THE RULING OF THE PREVIOUS COURT DENYING A MOTION TO SUPPRESS CERTAIN ORAL AND WRITTEN STATEMENTS, WITHOUT RECONSIDERING THE SAME.

ASSIGNMENT NO. I.
This assignment challenges the alleged failure of the court to require that the defendant have a mental examination to *233 determine his competency to stand trial and his competency at the time of the alleged crime. In order to get a complete picture of all matters surrounding the admitted failure of appellant to undergo a mental examination, we need to look at the complete history of that issue. On November 15, 1979, appellant's attorney filed a "Motion for Mental Examination." He filed one instrument in both indictments with the instrument carrying the circuit court numbers of both indictments. The motion was filed under MCA § 99-13-11 (1972), which provides that the trial court may order an accused to submit to a mental examination on motion made by the defendant, the district attorney, or the court's own motion. A hearing was had on the motion before Circuit Judge Leslie B. Grant on November 28, 1979. It should be noted that all three of the circuit judges in the district were involved in either motions or trial under the two indictments of appellant. Before the hearing on the motion began, appellant's attorney announced to the court that after advising appellant that the motion had been filed, appellant advised the attorney that he "would not voluntarily in any event" undergo such an examination. The attorney requested that he be allowed to withdraw the motion without hearing. The appellant was in the courtroom during the hearing. He was asked by the trial judge if he understood that the motion had been filed, and received an affirmative answer. Appellant was then asked if he understood that he was requesting that the motion be withdrawn. The court again received an affirmative answer. The court asked appellant, "Do you agree with that request?" Appellant's answer was, "Yes, sir." Accordingly Circuit Judge Grant stated that, "It does not appear to the court that he needs a mental examination and therefore the request to withdraw the motion is granted and the motion is considered withdrawn." A written order allowing the withdrawal was signed by Judge Grant and filed in both causes.
On November 30, 1979, the state through the district attorney filed a motion for mental examination of appellant. [Supp. Record Volume I, p. 44]. The motion recited the withdrawal of the motion filed by appellant and stated that due to the appellant's writing the two hereinbefore discussed notes to the jailor, that the state wished a mental examination of appellant. A hearing was had on this motion on November 30. [Supp. Record Volume II, p. 114]. This hearing was had before Circuit Judge Ruble Griffin, who later was the trial judge under the indictment for the death of Mrs. Mayer. The state's motion, as was the appellant's withdrawn motion, was a single instrument filed under the style and numbers of both indictments. The appellant was present in the courtroom during the hearing on the state's motion. The district attorney made an oral statement that is shown in the record regarding the two notes written voluntarily by appellant. The district attorney stated his doubts that appellant was insane, but it was thought by the prosecution that a mental examination should be had to be sure. Stating that, "I don't want the defendant setting the state up ... ." and "I don't want it to go unnoted that the state did not make an attempt."
It should be noted at the outset that appellant's attorney objected to the motion being granted, as only two days before appellant's motion had been withdrawn. Regardless of the objection of appellant through his attorney to the motion, the lower court properly proceeded to have a hearing on the motion under the strenuous objection of appellant and his attorney. After these objections and the statements by appellant's attorney that he and appellant were communicating satisfactorily, the following occurred: [Supp. Record Volume II, p. 122].
BY THE COURT: May I ask Mr. Wheat a question? Mr. Wheat, do you understand why it is you were brought back up here again today?
BY THE DEFENDANT: Yes, Sir. Do you want me to stand up?
(THE DEFENDANT STANDS BEFORE THE COURT)
BY THE COURT: Of course, that being that the District Attorney filed a Motion *234 to have you examined by a psychiatrist. My understanding is you previously before Judge Grant, who had heard all of the motions up to this point. I'm Judge Griffin. I'm the one who will be trying your case if we go to trial next week. It is my understanding that Mr. Stegall did file a Motion to have you examined by a psychiatrist.
BY THE DEFENDANT: I withdrew it.
BY THE COURT: You wanted him to withdraw it. Is that correct? What is your attitude about the motion today?
BY THE DEFENDANT: What?
BY THE COURT: What is your attitude about the District Attorney's Motion? Is it the same?
BY THE DEFENDANT: Well, I think I'm sane. I don't require a....
BY THE COURT: Just go ahead and explain it to me however you want to.
BY THE DEFENDANT: If the Court orders it I'm going to refuse it. I'm ready to go to trial Monday.
BY THE COURT: You say that you would refuse it?
BY THE DEFENDANT: Yes, Sir.
BY THE COURT: By that  Of course, we could physically remove you to the psychiatrist's office. You understand that?
BY THE DEFENDANT: I would remain silent.
BY THE COURT: You would remain silent. Of course, I cannot make a man talk. I don't have that power; and without him talking, Mr. Necaise, I don't think it ...
BY MR. NECAISE: I'll ask the Court to inquire any further if he has desires of having one, or if he resists ...
BY THE COURT: If he says he is not going to talk to one, I think the answer to that question has already been made.
BY MR. NECAISE: Could I ask the Judge to ask him that question for the purpose of the record?
BY THE COURT: All right. Are you desirous of having an examination? I believe that was the question.
BY THE DEFENDANT: I said if the Court appoints  demands that I  I can't hear too good. I've got an ear infection in both ears. I can't hear myself talk. If the court orders the examination I'm going to refuse to say anything to the psychiatrist. That's how it is.
BY THE COURT: In other words you don't want one?
BY THE DEFENDANT: Right. That's a way of saying it.
BY THE COURT: That's right. I think you're absolutely correct. There's no doubt about that. Are you hard of hearing, Mr....?
BY THE DEFENDANT: I have an infection in both ears. I had to see a doctor today; so, I can't hear too good. Both my ears are infected.
BY MR. STEGALL: Normally, Judge, his hearing is good.
BY THE DEFENDANT: Normally I have good hearing.
BY THE COURT: Oh, I see. Well, I notice you speak rather loudly. Sometimes people with poor hearing do talk louder.
BY MR. STEGALL: I told him to speak up to you, Judge.
BY THE COURT: Oh, you did? Well, he's responding to your advice. There's no question about that.
BY THE DEFENDANT: I have to hear myself talk. You know, I can't .. .
BY THE COURT: Yes. And have you ever been treated by a psychiatrist, Mr... .?
BY THE DEFENDANT: Yes.
BY THE COURT: Where was that, Mr. Wheat?
BY THE DEFENDANT: Most people who go to prison for a long time require psychiatric help because prisons are snake pits in New Jersey. It's a big insane asylum, you know; and ...
BY MR. STEGALL: Could I have the Court's indulgence?
BY THE DEFENDANT: ... problems, you know? It includes the prison officials as well as the inmates.
BY THE COURT: Well, this is not going to be held against him in this hearing. I think I am entitled to let him respond to the question. I'm not going to be a witness against him.
*235 BY MR. STEGALL: No, sir. I'm not concerned about the court.
BY THE COURT: And what he said here is not going to be used against him. You understand that?
BY THE DEFENDANT: Yes, Sir. But I'm saying it's not uncommon for a prison or prisoner in Trenton State Prison to be under psychiatric care. The majority of the inmates are. And a lot of times they may try to get themselves sent to the State Hospital because it's a lot better place than Trenton Prison. You've got more privileges; so, inmates try to play crazy to get sent there, not because they are crazy.
BY THE COURT: I don't doubt that at all, and I feel a little sympathetic with them. Go ahead. Do you have anything else you want to tell me?
BY THE DEFENDANT: I'm finished. I'll see you in trial Monday.
BY THE COURT: All right, Sir. Well, Mr. Necaise, I feel this way about it. I can't make a man talk to a psychiatrist; and Mr. Wheat has told me unequivocally  Let me ask you one other thing. Did you ever get a report from any psychiatrist, Mr. Wheat? Never did receive one?
BY THE DEFENDANT: They keep everything secret in prison.
BY THE COURT: Nobody has ever advised you that you do need medical treatment?
BY THE DEFENDANT: They say everybody in prison is crazy. All inmates are crazy. If they weren't crazy, they wouldn't be in prison. That's the way they think, you know? Sane people stay free, and crazy people wind up in prison, you know? I don't think I need any treatment right now. I'm fully prepared to go to trial and communicate with my lawyer in every way.
BY THE COURT: Well, of course, Judge Grant has already made a finding rather unequivocally that it didn't appear to him that the man needed any treatment. He hadn't indicated anything to me today that would cause me to think differently from what Judge Grant found. So, I find that the man's rational, able to communicate with his attorney, has expressed a desire to stand trial, and as far as his correspondence and things that he has done in the past, even in relation to this case, like statements made to the paper in Orlando, I'm not going to inquire into his motives in making those statements. I assume that he had it at least in his own mind, a good motive; and a motive, not good; but that would probably be a mistake to state that; but a motive that was in his own best interest. I think he is able to form motives, intent, that would be in his own best interest. Is that right, Mr.? And whatever purpose he made that, I think he felt like it might be to serve him well to make those type of statements; and I think he is nodding that he did do that. So, I think it would just be a waste of time to have the man  try to attempt to have the man examined in light of his statements that he has made here today. We can't anticipate everything that's going to happen two years from now or a year from now in the State Supreme Court or some federal court on petition for Writ of Habeas Corpus. I just can't anticipate all of that. As far as I'm concerned the man is ready to go to trial, able to go to trial. There's no doubt in my mind about that. I deny the State's motion and send him back to jail; and have everybody here at 10:00 Monday morning. I've had the jury ordered to come in at 9:30 to get the little cards filled out, so everybody can get a better look at who's here and all that; but I don't see the point any further on this. That's all. I don't like to disagree with the District Attorney, but in this case I do. I can't see there's any point in this. All right. Okay. You go back to jail.
BY MR. STEGALL: Thank you your Honor.
As hereinbefore stated the trial on appellant's indictment for capital murder of Mrs. Mayer was had the first week in December 1979 and ended on December 7. After the guilt phase of the trial was presented to the jury, the verdict was brought back finding *236 appellant guilty of capital murder on the morning of December 7. Immediately thereafter, and with appellant facing a possible sentence of death, his attorney filed another motion for mental examination of appellant. [Supp. Record Volume I, p. 47]. A hearing was had on this motion out of the presence of the jury and appears beginning at page 104 of Supp. Record Volume I. The Court requested appellant's attorney to ask him if he had changed his mind since insisting that the pre-trial motion for mental examination be withdrawn. The appellant then stated he had changed his mind and wanted an examination. The trial court held that it was going ahead with the sentencing phase of the bifurcated trial, but was going to sustain the motion for mental examination at the conclusion of the trial. Evidence was then presented on the sentencing phase and as hereinbefore stated, the jury was unable to agree on a verdict which resulted in the appellant receiving life sentence.
On December 11, 1979, four days after the conclusion of the trial, the trial judge entered a written order requiring a mental examination of appellant, naming the physician who would make the examination. [Dr. Henry Maggio, Supp. Record Volume I, p. 57]. The court in its order directed that the sheriff transport the defendant to and from Dr. Maggio's office.
What occurred after the court entered its order of December 11 appears in the hearing on appellant's motion for new trial after his conviction of capital murder of Mrs. Mayer [Supp. Record Volume I, p. 6]. At the outset of the hearing on the motion for new trial, appellant's attorney stated that appellant had requested him to advise the court he did not wish to proceed any further with any appeal. Appellant's attorney stated, however, he wished to proceed with the hearing on his motion for new trial. Appellant's attorney agreed that on December 7 after the jury's verdict on the guilt phase, appellant stated he had changed his mind and did want to undergo a mental examination. His attorney then went on to say that after the jury was unable to agree on a verdict in the penalty stage, the appellant had changed his mind and refused to undergo the examination ordered on December 11, even though he actually was carried before Dr. Maggio. [Supp. Record Volume I, p. 18]. The defendant requested that he be allowed to make a statement and the following colloquy of questions and answers were had between the trial judge and defendant:
BY THE DEFENDANT: I've been under a lot of pressure to submit to a psychiatric examination by a lot of people. And, uh, I definitely don't want to be examined and that's sort of the story. And, uh, I've come to this conclusion about not wanting to appeal. Uh, it's taken me a lot of time to think about it as a result of careful deliberation and, uh, it's not because I'm crazy like Mr. Stegall says.
BY THE COURT: Well, I don't think Mr. Stegall is accusing you of being crazy. Mr. Wheat. I think Mr. Stegall is a very sincere attorney and, uh, if there's any doubt about that, he wants it resolved and he wants to take advantage of every, uh, honorable, legal remedy that's available to him, for your benefit. That's Mr. Stegall's purpose of it by, uh, ... .
BY THE DEFENDANT: (Interposing) I realize that.
BY THE COURT: Yes, sir. You realize that.
BY THE DEFENDANT: Yes, sir.
BY THE COURT: And you're not mad with him because he raised the issue, are you?
BY THE DEFENDANT: Oh, no, no, we're still good friends.
BY THE COURT: All right.
BY THE DEFENDANT: We're still good friends.
BY MR. STEGALL: I thank you.
BY THE COURT: All right. Uh, of course, I'm going to, you can have your appeal without cost to you. Uh, I don't know what you want to, uh, I want you to think about it further.

*237 BY THE DEFENDANT: I've already thought you see, I believe that the, uh, that if I appeal it, it will be a repeat of the same thing, of the same thing, of the first trial. And I can't see making a ... go through this, you know, making a repeat performance.
BY THE COURT: Well, you're still facing another trial.
BY THE DEFENDANT: Right, right, right.
BY THE COURT: Here.
BY THE DEFENDANT: If I get a gas chamber verdict in the second trial, I will appeal.
BY THE COURT: Then, you can't... . .
BY THE DEFENDANT: (Interposing) I promise you that.
BY THE COURT: Then, you can't appeal this one because you will have waited too long.
BY THE DEFENDANT: What?
BY THE COURT: You will have waited too long to perfect an appeal in this case, you see... . .
BY THE DEFENDANT: (Interposing) I said, I said ...
BY THE COURT: ... ... if you wait till then.
BY THE DEFENDANT: I said if I get a gas chamber verdict in the second trial, I will appeal that.
BY THE COURT: That case only?
BY THE DEFENDANT: Right, right.
BY THE COURT: Oh, I... ...
BY THE DEFENDANT: (Interposing) This one right here, it's uh, it's over and done with as far as I'm I'm concerned.
BY MR. STEGALL: Judge, I'd like to talk with him further.
BY THE COURT: All right. I think you ought to consult with Earl further about it, Mr. Wheat, and, uh, you all talk about it. Of course, I'll grant you an appeal without cost to you, you understand.
BY THE DEFENDANT: All right. But, uh, nothing he can say or do is going to make me change my mind. I definitely don't want to appeal.
BY THE COURT: Well, I want you to give that to him in writing.
BY THE DEFENDANT: All right. Why can't we do it here, now?
BY THE COURT: No, sir. I'll let you do it in your uh, when you're in solitary by yourself. And, uh, I think it would work out better that way.
BY THE DEFENDANT: We, uh, have a little misunderstanding, you know, from time to time, but, uh, basically, we get along good, you know.
BY THE COURT: Well, that's natural. I've never known a lawyer and his client that didn't have some misunderstanding. It would be highly unusual if they didn't.
BY THE DEFENDANT: Right.
Summarizing what occurred regarding the mental examination of appellant, we have the following: his attorney filed pretrial motions in both causes which were withdrawn at the demand of appellant with the trial judge questioning appellant and ruling that he was entitled to withdraw his motion and he did not appear to need an examination. The state then out of an abundance of caution filed its own motion two days later requesting that appellant be forced to have such examination. Appellant stated positively that he would refuse to undergo such an examination and would stand mute. The court questioned appellant extensively and came to the conclusion that he did not need a mental examination. After the trial of the first case on the guilt phase, the appellant facing a possible death penalty changed his mind and stated he would agree to an examination. The lower court stated that an order would be entered after the conclusion of the trial to have a mental examination of appellant. In the meantime, however, appellant did not get the death penalty, so he again changed his mind and refused to have the ordered mental examination, even though being carried before an examining psychiatrist. It is evident that appellant was merely playing with the court. All three circuit court judges gave appellant every opportunity to *238 have an examination. It should be pointed out here that at no time did appellant or his attorney propound insanity as a defense to either indictment. In fact, it was announced to the court that appellant was not making a defense of insanity. [Supp. Record Volume II, p. 121]. We find no merit in appellant's first assignment of error. Whatever error was committed was done by appellant alone and was done according to the record in a rational manner.

ASSIGNMENT OF ERROR NO. II
Appellant contends under this assignment of error that he could not receive the death penalty as there was no proof of the crime of robbery in connection with the alleged murder. No authority or discussion is needed on the proposition that a person cannot be convicted of capital murder and receive the death penalty unless the alleged murder is done under certain circumstances. One provision of which is stated "When done without any design to effect death by any person engaged in the commission of the crime of rape, burglary, arson, or robbery, or in any attempt to commit such felonies." [MCA § 97-3-19 (1972)].
It is the contention of appellant that the testimony in regard to the taking of the car of the deceased was not "an intent to commit robbery." Appellant requested and received an instruction (D-13) defining robbery, which stated:
The elements of the crime of robbery are that the defendant must have intentionally and without authority of law taken the personal property of the said Joseph Mayer in his presence and against his will, by violence to his person or by putting him in fear of some violence to his person.
At approximately 9:30 p.m. on the night Joseph Mayer was killed, he was at the Worth Motel on the beach 26 miles from where he was killed that same night. The jury found that appellant killed him. Approximately two and one-half hours after the young couple were together at the motel, appellant appeared at the Netto home with the Mayer car which place was approximately 1.4 miles from where Mayer was killed. Appellant was in complete possession of the Mayer car, along with its contents, consisting of a leather case, luggage, books, camera, radio, baseball bat, and maps.
This Court had a similar set of facts before it in the case of Voyles v. State, 362 So.2d 1236 (Miss. 1978), cert. denied, 441 U.S. 956, 99 S.Ct. 2184, 60 L.Ed.2d 1059 (1979). We said the following in that case:
Appellant contends that the evidence was not sufficient for the jury to find beyond a reasonable doubt that the alleged killing occurred while appellant was engaged in committing the crime of robbery and, therefore, the appellant could not be guilty of the crime of capital murder, which is a crime punishable by death. Miss. Code Ann. § 97-3-19 (Supp. 1977). There is no contention that the jury was not completely, fully, and adequately instructed by the court on the questions of law involved in a so-called felony-murder. The court fully instructed the jury on the statutory definition of robbery, which, according to Code section 97-3-73, is as follows:
Every person who shall feloniously take the personal property of another in his presence or from his person and against his will, by violence to his person or by putting such person in fear of some immediate injury to his person, shall be guilty of robbery.
Appellant questions the sufficiency of the evidence to prove that he had the "intent" to commit the crime of robbery. This Court said in Shanklin v. State, 290 So.2d 625 (Miss. 1974):
Intent to do an act or commit a crime is also a question of fact to be gleaned by the jury from the facts shown in each case. The intent to commit a crime or to do an act by a free agent can be determined only by the act itself, surrounding circumstances, and expressions made by the actor with reference to his intent. Thompson v. State, 258 So.2d 448, (Miss. 1972); Lee v. State, 244 Miss. 813, 146 So.2d 736 (1962).

*239 The Court further said in Thompson v. State, 258 So.2d 448 (Miss. 1972), the following:
Unless one expresses his intent, the only method by which intent may be proven is by showing the acts of the person involved at the time in question, and by showing the circumstances surrounding the incident.
The criteria for this Court to use in passing on a motion for a directed verdict which was requested under this assignment by appellant is stated in Bullock v. State, 391 So.2d 601, 610 (Miss. 1980).
In passing upon a requested peremptory instruction, or motion for directed verdict in a criminal case, all evidence most favorable to the State, together with reasonable inferences, are considered as true and evidence favorable to the appellant is disregarded. If such evidence will support a guilty verdict, the request for peremptory instruction must be denied, as well as the motion for directed verdict. Warn v. State, 349 So.2d 1055 (Miss. 1977); Toliver v. State, 337 So.2d 1274 (Miss. 1976).
Fully considering the history of all that occurred on the night in question, the condition of Mayer's body with his hands and feet tied, and a bullet hole through the back of his head and shortly thereafter appellant being solely in full possession of the Mayer vehicle and its contents, is clearly a question for the jury as to whether or not he "robbed" Mayer of his car. There certainly is no other reason shown in this record for the brutal murder of young Mayer.

ASSIGNMENT OF ERROR NO. III
This alleged assignment of error may be disposed of merely by stating that the appellant did not request an instruction as he alleges in this assignment. The court fully instructed the jury as to all elements to be considered in finding that the killing of Mr. Mayer was "capital murder" rather than "murder," for the reasons discussed in Assignment No. II. Furthermore, appellant did not request an instruction on a lesser included offense as he now contends should have been given. As discussed in Assignment II the jury had ample evidence to find that the alleged murder was perpetrated during an intent to commit robbery. The jury was amply instructed that it was necessary for them to so find before returning a verdict of capital murder. We find no merit in this assignment of error.

ASSIGNMENT OF ERROR NO. IV.
Appellant contends that he should have been sentenced to life imprisonment at the conclusion of the guilt phase of the bifurcated trial and the jury should not have been allowed to return the death penalty verdict. The basis of this contention seems to be that because the trial for the alleged murder of Mrs. Mayer resulted only in a life sentence that the giving of the death sentence for the second murder committed at the same time is barred under the principles of res judicata and collateral estoppel.
Appellant, of course, is concerned by the fact that the jury in the penalty phase trial of the killing of Mrs. Mayer resulted in the jury not agreeing on the death penalty; whereas they did find a verdict for the death penalty in the case sub judice. Any court may take judicial knowledge that under the make-up of various juries, there is no prediction or known reason why different verdicts are reached. There is one situation, however, in the case at bar which stands out. It is that as we have hereinbefore discussed, a capital murder conviction and resulting death penalty may be had only if a murder is committed while performing certain other acts including robbery. The proof is that the car in the sole possession of appellant shortly after the death of young Mr. and Mrs. Mayer was owned by Mr. Mayer and not Mrs. Mayer. If we should speculate, which we do not, the first jury could have reasoned that Mr. Mayer was the one robbed of his property. We shall see later that the jury in the case sub judice specifically found that this was a robbery of "Mr." Mayer's property.
Appellant relies on the case of Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 *240 L.Ed.2d 469 (1970), Bullington v. Missouri, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981).
These cases easily are distinguishable from the case sub judice. In Ashe, we have masked men breaking up a poker game by robbing each individual player. Ashe was indicted for robbery of each person. On his first trial the jury found him not guilty. The issue in the case was a question of "identity," as to whether Ashe was one of the robbers. The first jury found he was not. The Supreme Court held that the rule of collateral estoppel applied and the prosecution should not be allowed to have another jury pass on this question. In the case at bar, we have an entirely different situation  there were two murders. Appellant was tried and convicted of capital murder. The only difference between the two trials was that the jury in the first failed to agree on punishment. The case sub judice was a trial for a separate and distinct murder, for which he had not received a prior acquittal. In the penalty phase of the trials there was no question of identity as the Supreme Court had in Ashe, supra.
In Bullington, supra, there had been a prior trial and an acquittal of the accused, which as shown above was entirely different from the facts presented in the present case. We find no merit in this assignment.

ASSIGNMENT OF ERROR NO. V.
Appellant alleges error in the refusal of the trial judge in the case sub judice to rehear a request by appellant to suppress the two voluntarily given notes written in appellant's handwriting while confined in jail. We heretofore have discussed these notes. It is admitted that appellant had been given all of his constitutional warnings, including Miranda, an attorney was appointed for him and representing him at the time. Admittedly, without consulting his attorney, appellant wrote the two notes in question in his cell and gave them to the jailor to be given to the head jail warden. Appellant was the one who chose to do this without consulting his attorney.
Prior to the trial for the death of Mrs. Mayer, appellant's attorney moved to suppress both of the notes. This motion was styled and filed as a motion in both indictments and as one instrument filed in both causes. The hearing before the trial judge prior to the first trial definitely was a hearing on both indictments. The lower court in refusing to suppress the voluntarily written statements said:
Well, the court finds beyond a reasonable doubt that on November 29, 1979, [the day the notes were written], that the defendant was aware of his Fifth Amendment Rights and any notes that he wrote on that day were freely and voluntarily written without coercion, threats or intimidation and I will hold that they are admissible for whatever evidentiary value they may have whether it be for verification of his handwriting or whatever significance the Jury might attach to it.
At the trial of the case sub judice before a different trial judge, appellant's attorney again requested that the notes be suppressed. The most that can be said is that he was trying to get a second judge to change the court's mind. This could not be done. We have already seen that the prior hearing was in both cases and the ruling of the first trial judge applied to both. No new grounds whatever were offered in the trial sub judice to change the ruling made by the first trial judge. We find no merit in this alleged assignment of error.
This Court carefully has considered the entire record in the cause, together with all exhibits, briefs, and all instruments appearing either in the original record or the supplemental volumes of the record and they clearly reveal that the jury was fully and adequately instructed before considering either the guilt phase or the penalty phase of the bifurcated trial. On the penalty phase the state and the appellant introduced all of the record involving the guilt phase of the trial. Appellant introduced nothing else. The state introduced appellant's prior record consisting of a conviction of second degree murder, a conviction of assault with an offensive weapon and a conviction of false imprisonment.
*241 Full and complete instructions were given the jury on the sentencing phase according to prior opinions of this Court involving the same instructions which have been approved by the United States Supreme Court. The jury unanimously found that there were insufficient mitigating circumstances to outweigh the aggravating circumstances. They found that the murder of Mayer was committed in the course of the crime of robbery adding "the car belonging to Joseph Mayer." The jury specifically found that in addition to appellant committing the murder in the course of the crime of robbery, that the murder was committed in an especially heinous, atrocious and cruel manner in that the victim was bound hands and feet by his own clothing, was shot in the back of the head by direct contact, his body abandoned in a secluded area, and that appellant was previously convicted of three felonies.
Under the capital murder statute [MCA § 99-19-101 Supp. 1981)] adopted by the Legislature on April 13, 1977, and appearing as the Laws of 1977, Chapter 458, the Legislature confined aggravating circumstances to eight sub-head situations. In the case sub judice the trial judge instructed the jury that they were only to consider three statutory circumstances, they being the ones listed specifically by the jury in its verdict. The lower court correctly confined the jury to finding only aggravating circumstances that were proven by the evidence. The jury was not left to make its own findings of aggravating circumstances as was condemned in Jordan v. Watkins, et al., 681 F.2d 1067 (5th Cir.1982). The court's instructions "channelled the sentencers' discretion by `clear and objective standards and provided specific and detailed guidance.'" The court specifically instructed the jury that it was to find beyond a reasonable doubt that one or more of the three above discussed aggravating circumstances existed before a death penalty verdict could be returned and was specifically instructed that if none of these elements were found to exist, the death penalty could not be imposed. The jury's authority was limited and it was specifically instructed regarding its consideration of aggravating circumstances under the evidence submitted. No speculation was left for the jury.
We have carefully reviewed the present record, along with all of the death penalty cases considered by this Court subsequent to Jackson v. State, 337 So.2d 1242 (Miss. 1976). We have carefully compared those cases with the present case and clearly find that the conviction and death penalty verdict of appellant in the present case is consistent and even-handed with all of the death penalty cases reviewed as stated above.
A study of the entire record convinces this Court that the sentence of death was not imposed by the jury under influence of passion, prejudice or any other arbitrary factor. The evidence reveals that the jury was fully warranted in finding the statutory aggravating circumstances to exist as shown in the jury's verdict. The sentence of death clearly was not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. As stated, all death cases subsequent to Jackson, supra, have been fully reconsidered by this Court, and we do not find any prejudice or error in the present case after such consideration.
The record reveals that appellant's trial attorneys were competent and defended appellant in a vigorous, reputable and efficient manner. He received a fair trial.
The cause is affirmed and December 8, 1982, set for the execution of the death sentence as provided by law.
AFFIRMED.
PATTERSON, C.J., SUGG and WALKER, P. JJ., and BROOM, ROY NOBLE LEE, HAWKINS, DAN M. LEE and PRATHER, JJ., concur.