362 So.2d 1236 (1978)
Jimmy VOYLES
v.
STATE of Mississippi.
No. 50648.
Supreme Court of Mississippi.
September 20, 1978.
*1237 David R. Sparks, Tupelo, for appellant.
A.F. Summer, Atty. Gen. by Marvin L. White, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc:
BOWLING, Justice, for the Court:
Appellant, Jimmy Voyles, was indicted and tried in the Circuit Court of Lee County for the crime of capital murder of one Bernice Griggs. The trial was bifurcated as to guilt and sentence under the guidelines set out by this Court in Jackson v. State, 337 So.2d 1242 (Miss. 1976), as codified by legislative enactments set out in Mississippi Code Annotated sections 99-19-101 and 99-19-103 (1977 Supp.). The guilty phase of the trial resulted in a unanimous jury verdict convicting appellant of capital murder. The sentence phase of the trial was conducted before the same jury which returned a verdict of death. The procedure in this phase of the trial will hereinafter be discussed in more detail.
Under the requirements for appeal and review by this Court of all capital murder convictions, the Court has studied carefully every aspect of the case  whether or not such were discussed in the briefs submitted. Bell v. State, 360 So.2d 1206 (Miss. 1978); Irving v. State, 361 So.2d 1360 decided August 2, 1978; Washington v. State, 361 So.2d 61 decided July 12, 1978. The first requirement is that the Court make a meticulous examination of the evidence presented to the jury. This has been done and a resume of that evidence follows.
Bernice Griggs disappeared on March 12, 1976. Prior to and at that time she was living with her twenty-year-old daughter, Glenda Phillips, near Amory, Mississippi. Other inhabitants of that place of abode were the daughter's husband and their small child. Mrs. Griggs was forty years old. The testimony of the daughter revealed that appellant, age thirty, and Mrs. Griggs had been dating for approximately two months prior to the time of Mrs. Griggs' disappearance.
Witness Danny Lee Dunaway, a resident of Saltillo, testified that on July 13 or 14, 1976, he and his brother Guy were in a boat going down stream in the creek known as "Bucy Bottom." They were hunting turtles. About a mile down stream from the Bucy Bottom Creek bridge, they saw a log and debris in the water and saw what appeared to be a hand sticking up by the log. This was verified when they reached the scene.
The next witness, Douglas West, a deputy sheriff, testified that he received a call pertaining to the find in the creek. He, the sheriff, and other deputies promptly event to the scene. They saw the hand and on investigation found what appeared to be the remains of a body tangled in the debris in the creek. They secured a wool blanket and placed it down in the water under the body remains, lifted all from the water in the blanket, and laid the entire skeletal remains on the ground near the edge of the creek. Photographs were made at that time, prior to further moving of the remains. Four photographs were introduced in evidence as exhibits before the jury. Witness West pointed out in the photographs the remains of a jacket or blouse that was around the rib cage of the disintegrated body and skeleton. This cloth later was removed and retained for evidence and was introduced into evidence by witness West.
Glenda Phillips, the daughter of Mrs. Griggs, described the meeting of appellant and her mother about two months prior to March 12, 1976. The two people dated during that period of time. She testified that appellant and his nephew, Hoyt Mayo arrived at her home about seven o'clock A.M. on March 12. The mother carried the daughter to her place of work and the next time the daughter saw Mrs. Griggs was that afternoon about five o'clock when she returned home. Shortly thereafter, the appellant, Hoyt Mayo and Mrs. Griggs left the home in Mrs. Griggs' car. This was a brown Malibu vehicle, whereas prior to that date Mrs. Griggs owned a blue Ford vehicle. According to Mrs. Phillips, her mother was going to visit another daughter.
*1238 The next time Mrs. Phillips saw or heard from any of the three persons was Sunday, March 14, 1976, when appellant and Hoyt Mayo came to her home. She asked them where her mother was, and was told by appellant that Mrs. Griggs, while at a truck stop, had left for Texas with a man in a truck; and that he (Voyles) had put her clothes and other possessions in the truck before she left. Mrs. Griggs, according to Voyles, had told him he would be hearing from her.
About two weeks later, Voyles came back to Mrs. Phillips' home. He told her that he was keeping Mrs. Griggs' car at her request. He further told the daughter that he had received a letter from her mother and would bring it the next time he came by.
Mrs. Phillips identified the remains of the clothing taken from the body hereinbefore described. Her positive testimony was that this was the remains of a "polka dot" jacket that she actually owned, but it was being worn by her mother on March 12, when she left home with appellant and Mayo.
Mrs. Phillips further testified that the only time she heard her mother and appellant arguing was on the night of March 11. The argument was the result of Mrs. Griggs' refusal to allow appellant to go to his place of abode in her car. Mrs. Griggs was crying while they were in the kitchen, at which time appellant "just drew back his fists, but he never did hit her or nothing." The argument ended when appellant left the Phillips' home walking.
Witness J.C. Holley was employed by Crowder Chevrolet Company in Columbus, Mississippi. He testified that on March 12, 1976, Mrs. Griggs, in the company of two men, came to the place of business and the visit resulted in Mrs. Griggs trading cars. She bought a brown Malibu vehicle and traded in a blue Ford. The vehicle was financed through General Motors Acceptance Corporation. Mr. Holley had no further connection with the car for two or three months after its purchase when he learned that it had been repossessed for nonpayment of the purchase price installments. Holley testified that Mrs. Griggs purchased insurance on the vehicle and listed on the application that the appellant would drive the car approximately twenty-five percent of the time.
Witness Nolan Nanney was in the automobile business in Tupelo, and had been for about sixteen years. He had known appellant for a long time. On June 8, 1976, at an automobile auction in Baldwyn, the witness was there to purchase vehicles when he found that appellant was at the auction offering for sale a 1974 brown Malibu automobile, for which he wanted the sum of $2500. Nanney offered $2300 and the offer was accepted by appellant, who reported to the witness that the car was owned by him. A draft was issued by Nanney with the condition thereon that acceptance would be completed only if proper title papers were attached thereto. He testified that upon presentation of the draft there were no title papers and therefore he did not accept it and consequently rescinded the proposed sale. The witness identified the serial number of the vehicle as the same serial number previously testified to by the witness Holley. Nanney testified that Voyles told him he had secured the car from his brother-in-law in Memphis.
Dr. Edwin Allen Raines, a pathologist, testified about examining the remains of the body found in the creek. He could not give a cause of death because of the extent of deterioration. He testified that several bones were broken and that the remains were of a human, "probably" of the female species.
Witness George Bobo was employed by General Motors Acceptance Corporation and had been acquainted with appellant for several years. He had had a conversation with appellant around the first of June, 1976, after having ascertained that the appellant was with Mrs. Griggs when the vehicle was purchased. Shortly thereafter, the witness contacted appellant at his place of employment, and asked him if he had knowledge of the location of Mrs. Griggs' car. Appellant told him that he knew where Mrs. Griggs was in Texas and that *1239 he would get in touch with her about getting the car back to Mississippi. Later, the witness had another conversation with appellant, who agreed to go to Texas and return the car for the sum of $150. Appellant did not indicate to the witness that he already had possession of the car in question.
Witness Hoyt Mayo is the nephew of appellant, and had reached eighteen years of age on February 18, 1976. Mayo testified, in regard to the trip to buy the brown Malibu car on March 12, 1976, that he, the appellant Voyles and Mrs. Griggs' young grandchild accompanied Mrs. Griggs that day. He had only seen Mrs. Griggs a couple of times prior to that day. Continuing, Mayo testified that Mrs. Griggs traded her Ford vehicle for the brown Malibu Classic vehicle and that when they left the dealership, Voyles was driving. Afterwards they all proceeded to the Griggs' home near Amory, and upon arriving, Mrs. Griggs left in the car and was gone about twenty-five or thirty minutes. Appellant and the witness remained at the Phillips' home during that time. Upon Mrs. Griggs' return, she packed some clothes and said she was going to see another daughter who was in a training school in Columbus at that time. With Voyles driving, these three people, Voyles, Mrs. Griggs and Mayo, first went to Amory. There the appellant and Mrs. Griggs went into a store to buy something for the daughter Mrs. Griggs was going to visit. The next stop, according to Mayo, was at a service station to fill the car with gasoline. They then went to Tupelo where they stopped at another service station to check the oil in the car. Mayo testified that he went in the restroom and while he was there appellant came in and said he was going to "Bucy Bottom to whip this woman." Mayo stated he then asked appellant to take him somewhere and let him out. After all had returned to the car, the appellant told Mrs. Griggs he was going to Bucy Bottom to take Mayo to see his sister. With the appellant driving the vehicle, no stops were thereafter made until they reached Bucy Bottom. The appellant then stopped the car at a bridge which spanned the creek located in this area. According to Mayo, appellant then asked Mrs. Griggs to get out of the car and when she did appellant began beating her with his fists. Mrs. Griggs was beaten until she was unconscious. Before losing consciousness, Mayo stated that she was calling for help, but when he got out of the car to assist her, appellant told him, "If you don't leave me alone, I'll kill you too. You don't mean no more to me than she does."
Mayo then testified that Voyles got in the car, started the motor, and backed it up over Mrs. Griggs' body; that he then went down the road, turned around, and then drove forward over her body. Further, Mayo stated that Voyles then told Mayo to roll the body off in the creek. When Mayo refused, Voyles got out of the car, taking the keys with him, and threw the body into the creek himself. Voyles then drove the car down the road about a mile, stopped the car, and took approximately $90 from Mrs. Griggs' purse, which was still in the car. Voyles and Mayo then went to Tupelo and attended a wrestling match and according to Mayo, appellant reiterated that he would kill him if he told anyone about what occurred. A conversation took place as to whether or not they should return to the scene of the incident and secure Mrs. Griggs' false teeth that had fallen in the roadway. Voyles then stated that he would not do so, as cars passing over the road would run over them.
According to Mayo, about a week after the incident, he went with the appellant to the Griggs' home to secure some of the clothes that Voyles had previously left there. He related the conversation between Mrs. Phillips and appellant, wherein she asked if he had heard from her mother. Appellant told her that he had received a letter and that she was in Texas, and that such letter was at home but he would bring it to her later.
On direct examination, Mayo was asked, "Did Jimmy Voyles tell you why he did this?" His response was, "Yes, sir, he killed the woman  he told me before that he had killed the woman because she wouldn't put the car in his name."
*1240 On cross-examination, the attorney for appellant attempted to elicit from Mayo that he was the one who really killed Mrs. Griggs. Mayo denied appellant's "version" of what happened, but did admit he was a co-indictee for the crime.
The state rested after Mayo's testimony. Appellant Voyles then testified. He was first asked if he had ever been convicted of a crime. He replied in the affirmative, first stating that it was for armed robbery, and then changed his answer to a conviction of burglary. Actually, he had pled guilty to a second charge of burglary. He then related the circumstances whereupon he met Mrs. Griggs, and stated that he dated Mrs. Griggs for about two and a half months. Voyles then described the trip on March 12 when Mrs. Griggs traded cars. Voyles then related facts pertaining to the trip later that day to take Mrs. Griggs to see her other daughter. He stated that during the trip all three of them consumed alcoholic beverages. His testimony was that during the stop at the service station, Mayo went to the restroom and called him to go with him, whereupon Mayo stated he was going to kill "Bernice" and rob her. According to appellant, he tried to convince Mayo not to take that action. With the appellant driving, they then left the service station, and drove to Bucy Bottom, telling Mrs. Griggs that he was taking Mayo to see his sister. When they reached the creek bridge, Mayo told him to stop the vehicle on the bridge, which he did. According to appellant, Mayo then told Mrs. Griggs to get out of the car, and after she did, Mayo began beating her with his fists and a "small lug wrench." According to Voyles, he told Mayo, "Hoyt, there ain't no use in that right there," and Mayo replied, "Jimmy, get back  if you don't I'll give you the same thing." Voyles then testified that Mayo told him to start the car and back up, and that when he did he accidentally backed over Mrs. Griggs' body. Mayo then threw Mrs. Griggs' body from the bridge into the water.
Thereafter, Voyles stated that he then drove the car away from the bridge and that Mayo then proceeded to take $96 from Mrs. Griggs' purse. (This purse was later discarded in a nearby garbage container). Voyles further stated that Mayo admonished him not to say anything about the matter or "I'll give you the same thing."
According to Voyles, Mayo and Mrs. Griggs "argued a lot" before the day of her death. His only explanation for such arguments was that Mrs. Griggs did not want Mayo along when she and Voyles were together.
On cross-examination, the appellant reiterated the same facts, contending that Mayo was the one who killed Mrs. Griggs and that the killing was over his protest. He denied that he, at any time, either planned or attempted to rob and kill Mrs. Griggs. The defense introduced one other witness, John Brown, manager of Home Credit Company of Tupelo. He testified that appellant had an account with his company and that he knew both appellant and Hoyt Mayo; that he had gone to the place where Voyles was employed and there had seen Mayo standing by a brown 1975 Malibu vehicle. Brown testified that Mayo told him that he owned the car. On cross-examination, Brown stated that he had seen appellant driving the car but had never seen Mayo driving it.
After receiving instructions the jury retired to consider the guilt phase of the trial and returned into court the following verdict:
"We, the jury, find the defendant guilty of capital murder."
The jury was then instructed as to the sentencing phase of the bifurcated trial, and after receiving instructions and hearing arguments of attorneys, returned into court the following verdict (which was written in pen and signed by the foreman):
We, the jury, unanimously find that the aggravating circumstances of (1) the capital offense was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or *1241 attempting to commit, any robbery[*], rape, arson, burglary, kidnapping, aircraft piracy or the unlawful use or detonation of a bomb or explosive device. (2) The capital offense was committed for pecuniary gain; and (3) the capital offense was especially heinous, atrocious and cruel, are sufficient to impose the death penalty and that there are insufficient mitigating circumstances to outweigh the aggravating circumstances, and we unanimously find the defendant should suffer death.
After judgment was entered on the findings of the jury, appellant, through his attorney, filed a motion for a new trial, which motion was overruled.
On this appeal, appellant propounds nine assignments of error. They are.
1. The trial court erred in overruling defendant's motion for a new trial.
2. The trial court erred in allowing the jury to view photographs of a badly decomposed body (alleged to be that of the victim) in that such evidence tended to prejudice the defendant in receiving a fair, impartial and unbiased trial.
3. The trial court erred in allowing the introduction of items into evidence by the state when it had failed to comply with a court order requiring the state to submit such evidence to the defendant prior to the deadline as set out by the court.
4. The trial court erred in refusing to grant the defendant's motion for a directed verdict or peremptory instruction when the state failed to prove essential elements of the charge as stated in the indictment.
5. The trial court erred in refusing to grant the defendant's motion for a directed verdict or peremptory instruction after the state had failed to prove corpus delicti.
6. The trial court erred in limiting counsel's closing argument to twenty minutes.
7. The trial court erred in limiting the defendant to only six instructions in a capital case.
8. The trial court erred in refusing to grant defendant's Instruction No. 42.
9. Reversible error occurred in the sentencing stage of appellant's trial after the state had failed to prove any aggravating circumstances, where the jury, in rendering its verdict, stated that its decision to impose the penalty of death was reached after considering the mitigating and aggravating circumstances of the case surrounding the crime with which the appellant was charged.
PROPOSITION 1. The alleged errors of appellant here are all covered under the succeeding allegations of error and shall be discussed therein.
PROPOSITION 2. Appellant contends that the introduction of four photographs made by the law enforcement officials of the remains of the body taken from the creek were inflammatory and prejudicial and should not have been admitted.
As hereinbefore related, the testimony of the deputy sheriff, who took the pictures, was that the pictures were made with the remains exactly as they were lifted from the water  in the blanket and placed on the ground. In addition to this, each photograph shows the article of clothing that was partially connected to the remains. This clothing was subsequently identified and retained as evidence. Mrs. Griggs' daughter, Glenda Phillips, testified positively that the article of clothing shown in the pictures and introduced in evidence at the trial was her jacket, that the jacket was being worn by her mother at the time she last saw her on March 12, 1976.
This Court has held that in considering the competency, relevancy and materiality of photographs, it is within the sound discretion of the trial judge to determine whether or not the photographs have a legitimate evidentiary purpose. Irving v. State, 228 So.2d 266 (Miss. 1969); Martin v. State, 217 Miss. 506, 64 So.2d 629 (1953); Coleman v. State, 218 Miss. 246, 67 So.2d 304 (1953). We observe that upon presentation of the photographs by the state, appellant's *1242 attorney did not object to their admissibility on the grounds that they were inflammatory and prejudicial against the accused. This Court has held in many cases that alleged error will not be considered unless objections thereto are made at the trial level in order to give the trial judge an opportunity to rule thereon. However, we do not reach that decision here, because due to the nature of the case, the Court is obligated to review all evidence. In the first place, we do not find that the photographs are such that a jury would be influenced or prejudiced by an inspection of what is shown. They merely confirm the testimony of witness West as to the contents of the blanket immediately after taking them from the water. In the second place, each picture shows a positive item of evidence necessary to establish the identity of the body and each photograph is an important piece of affirmative evidence. Hence, the court's allowing such photographs to be admitted into evidence cannot be reversible error in this case.
PROPOSITION 3. Appellant contends that he was prejudiced by the failure of the state to produce tangible state's evidence for inspection by his attorney prior to the actual trial. Admittedly, the proper motion was made and an order was entered on April 25, 1977, sustaining the motion and directing the state to produce such evidence by May 3, 1977. For some reason not clear from the record, the items were not presented by that date. However, the court extended this original order until May 30, 1977, by a second order dated May 25, 1977. Both parties agree that on May 26 the investigator for the office of the district attorney brought the items requested to the office of appellant's attorney. However, the appellant's attorney refused to accept the items and refused to sign a receipt therefor. He also refused to make any further effort to examine tangible evidence in the possession of the state, even though these items were presented to him four days prior to the deadline under the extended order. The trial began on June 7, 1977, thirteen days after the items were submitted to appellant's attorney and refused.
Appellant has not shown any prejudice by his attorney being offered the inspection of the items of evidence on May 26, pursuant to the extended order, rather than on May 3. Furthermore, the only items of evidence were the four photographs and the remains of the jacket found around the skeleton taken from the water. Certainly, thirteen days would have been sufficient time for the appellant's attorney to examine these items and do anything he wanted pertaining thereto, even to the extent of requesting further time before trial. However, this was not done.
PROPOSITION 4. Appellant contends that the evidence was not sufficient for the jury to find beyond a reasonable doubt that the alleged killing occurred while appellant was engaged in committing the crime of robbery and, therefore, the appellant could not be guilty of the crime of capital murder, which is a crime punishable by death. Miss. Code Ann., § 97-3-19 (Supp. 1977). There is no contention that the jury was not completely, fully and adequately instructed by the court on the questions of law involved in a so-called felony-murder. The court fully instructed the jury on the statutory definition of robbery, which, according to Code section 97-3-73, is as follows:
Every person who shall feloniously take the personal property of another, in his presence or from his person and against his will, by violence to his person or by putting such person in fear of some immediate injury to his person, shall be guilty of robbery.
Appellant questions the sufficiency of the evidence to prove that he had the "intent" to commit the crime of robbery. This Court said in Shanklin v. State, 290 So.2d 625 (Miss. 1974):
Intent to do an act or commit a crime is also a question of fact to be gleaned by the jury from the facts shown in each case. The intent to commit a crime or to do an act by a free agent can be determined only by the act itself, surrounding circumstances, and expressions made by *1243 the actor with reference to his intent. Thompson v. State, 258 So.2d 448 (Miss. 1972); Lee v. State, 244 Miss. 813, 146 So.2d 736 (1962).
The Court further said in Thompson v. State, 258 So.2d 448 (Miss. 1972), the following:
Unless one expresses his intent, the only method by which intent may be proven is by showing the acts of the person involved at the time in question, and by showing the circumstances surrounding the incident.
As we heretofore have seen in the analysis of the evidence, appellant and Mrs. Griggs had "gone together" for a period of approximately two months without any noticeable difficulty. The only evidence obtainable to show any difficulty occurred the night prior to the alleged crime, when appellant and the deceased had an argument because she would not let him have the car. On this occasion, according to the daughter of the deceased, appellant "drew back his fists" but did not complete the act of striking Mrs. Griggs. We therefore have the situation, that on the following day when the alleged crime took place, there was no known motive for appellant killing the deceased other than regarding possession of the car.
Witness Mayo, the eighteen-year-old nephew of the thirty-year-old appellant, testified that the appellant told him that "he killed the woman  he told me before that he had killed the woman because she wouldn't put the car in his name."
As stated above, the jury was fully instructed that it was necessary for them to find that appellant had the intent to rob when the act of killing was done. As we have heretofore seen, this intent may be shown by the acts of the person involved as well as the circumstances surrounding such actions. It is not necessary for that intent to be express and the subsequent acts were an important factor for the jury to consider. After having his first argument with the deceased, regarding taking the car the night before, it is certainly reasonable for the jury to conclude that the appellant actually took the car after performing the acts as testified to by Mayo, his accomplice. In addition to this, he took either $90 or $96 in money from the purse of deceased shortly after the killing. He then kept the vehicle for at least three months before trying to sell it. All of the surrounding facts and circumstances clearly authorize the jury to find that appellant did, according to Mayo, "kill the woman because she wouldn't put the car in his name" and killed her for the purpose of taking the car and/or the money. The record is devoid of any other reason for the killing, and this Court cannot say that there is any other reasonable hypothesis upon which to reverse the jury's findings.
PROPOSITION 5. The state clearly proved corpus delicti. The testimony of Mayo, which was obviously believed by the jury, clearly was sufficient to find that appellant either killed, or rendered Mrs. Griggs unconscious with his bare fists; he then ran over her twice with the car; and thereafter threw her either unconscious or dead body, with its broken bones, into the creek. The testimony of Glenda Phillips, daughter of the deceased, clearly identified the body in question as that of her mother.
PROPOSITION 6. Appellant's attorney alleges that the lower court erred in granting him only twenty minutes in closing argument. He does not say whether this contention is in regard to the argument at the end of the guilt phase of the trial or the sentencing phase. An examination of the record shows absolutely nothing in regard to time limit on arguments at the guilt phase. The only thing therein is an admonition by the trial judge to the spectators in the courtroom that no one would be allowed to enter or leave during presentation of the case to the jury, and his estimation was that it would take approximately one and one-half hours.
At the sentencing stage the only thing in the record is the following:
BY THE COURT: All right, C-1 will be given. All right, gentlemen, that takes care of the instructions of law. Each side *1244 has requested, or rather the state has requested twenty minutes to present closing arguments to the jury. Does the Defendant wish to present final argument?
BY MR. TIMMONS: Yes, sir.
BY THE COURT: All right, then, are you ready for the jury?
BY COUNSEL: Yes, sir.
No where in the record is there a request for a specific time by appellant's attorney or any limitation by the court. This alleged error, therefore, is without merit.
PROPOSITION 7. Appellant's attorney contends that the trial court erred by limiting appellant to six instructions on the guilt phase of the case. This purportedly was pursuant to the rules of procedure of the trial court. The record shows that no such limitation was made by the court. On page 165 of the record the court stated: "Under the circumstances of this case, the rule will be waived and more than six instructions will be considered, but you have offered one or two that's almost repetitive to the ones given before."
On page 168 of the record, the court, shortly before presenting the case to the jury, further clarified its position and we find the following:
BY THE COURT: Anything else?
BY MR. YOUNG (District Attorney): If I might clarify one thing for the record, Your Honor. I am not objecting or anything here, I just want to say this. This last thing you said for the record, it is my understanding that you did point out to Mr. Sparks that he could put in additional instructions if they are substantive law that hasn't already been covered?
BY THE COURT: That's correct, but the Court pointed out to defense counsel that the Court would consider additional instructions if counsel pointed out to the court why they were needed for this particular kind of case. All right, gentlemen, we will be in recess until 1:30.
An examination of the record showing the instructions requested by appellant, reveals that the jury was fully instructed as to appellant's defense in the case. Those marked "refused" on the guilt phase of the trial were either erroneous or repetitious of other granted instructions.
In regard to the sentencing phase of the trial, there can be no doubt from the record that all fifteen instructions offered by appellant's counsel were fully considered by the trial court.
PROPOSITION 8. Appellant contends that the refusal to grant Instruction No. 42 for the penalty phase of the trial was erroneous. This instruction states:
The Court instructs the Jury that in considering any prior record of conviction of an offense by the Defendant, the jury cannot consider prior convictions as indicative of a pattern of criminal conduct or habit that warrants the inference or belief of incorrigibility or the belief that the Defendant is an habitual criminal.
An examination of the record and all the instructions to the jury clearly reveals that it was thoroughly, properly and plainly instructed regarding the sentencing feature of the case. The jury could not have been confused or misled. The granting of the refused instruction D-42 would have been a clear comment by the court on the evidence. The only prior criminal record was a conviction and a plea of guilty to burglary. There was no indication of accusing the appellant as being a "habitual criminal."
As a further indication that the jurors clearly understood the instructions and the scope of their inquiry, is the fact that out of all statutory aggravating circumstances they could consider, they made three definite findings: (1) The offense was committed while the defendant was engaged in the commission of, or an attempt to, commit robbery; (2) the capital offense was committed for pecuniary gain; and (3) the capital offense was especially heinous, atrocious and cruel. Therefore, this proposition cannot be reversible error.
PROPOSITION 9. Appellant complains that the state did not introduce any further evidence on the sentencing phase of the trial. Neither did the appellant. *1245 Under the prior guide lines of this Court, the state is not required to produce additional aggravating circumstances. In fact, the defendant in such cases should have an advantage if the state makes no further offer of proof. It is clear from the record in this case that all the aggravating circumstances in connection with the commission of the alleged crime were already before the jury. The Court cannot speculate as to whether or not there were any possible mitigating circumstances that were not submitted. The jury found three separate and distinct aggravating circumstances from the testimony presented to it. Under the applicable statute, it was only necessary for them to find one aggravating circumstance. Clearly, the jury could find from this record that there were insufficient mitigating circumstances to outweigh the aggravating circumstances, both from the evidence already heard and the fact that no mitigating circumstances were offered.
As is our duty so to do, we have examined carefully the entire record and after a thorough study of the assignments of error, as well as any other possible errors, we are forced to the conclusion that no reversible error was committed. The jury found that this was an especially heinous, atrocious and cruel crime, and we are compelled under the facts and circumstances of this case to agree with such a finding. The case is therefore affirmed.
AFFIRMED AND WEDNESDAY, NOVEMBER 1, 1978, IS SET AS THE DATE OF EXECUTION OF THE DEATH SENTENCE.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, BROOM, LEE and COFER, JJ., concur.
NOTES
[*] Underlining made by the jury.