551 So.2d 165 (1989)
Gregory DAVIS
v.
STATE of Mississippi.
No. DP-86.
Supreme Court of Mississippi.
July 26, 1989.
Rehearing Denied September 27, 1989.
*166 Alvin M. Binder, A. Randall Harris, Binder, Milner & Milner, Jackson, for appellant.
*167 Mike Moore, Atty. Gen. by Marvin L. White, Jr., Asst. Atty. Gen., for appellee.
En Banc.
PITTMAN, Justice, for the Court:
Gregory Davis was indicted for the capital murder of Addie Reid by the grand jury of the Circuit Court for the First Judicial District of Hinds County, Mississippi. The cause was transferred to Forrest County for trial on a motion for change of venue. After a bifurcated trial Davis was convicted of capital murder and sentenced to death. From that conviction and sentence he appeals, assigning four errors. Finding no reversible error, we affirm the conviction and sentence.
On March 31, 1987, Gregory Davis, a resident of Jackson, Mississippi, went to Manship Street to visit a friend who lived in an apartment there. Davis arrived at the apartment at around 7:00 p.m., but his friend was not at home. Davis then walked next door to 901 Manship, the home of Addie Reid, an eighty year old widow who lived alone. Davis checked the doors and windows to see if Mrs. Reid was at home and alone. He then unscrewed the light bulb on the front porch. Davis then went around to the back of the house where, using a small table, he entered the house through the bedroom window, which was unlocked. Once inside Davis took eight or ten dollars from Mrs. Reid's purse and then hid behind the bedroom door as Mrs. Reid entered the room. Once she saw Davis, Mrs. Reid began to scream. Davis struck Mrs. Reid several times in the face, and then put his arm around her neck and dragged her from the bedroom into the dining room. After strangling her Davis covered Mrs. Reid's face with a towel and sexually assaulted her. He then left the house through the front door and walked up Manship Street in a westerly direction past a doctor's office. Davis threw Mrs. Reid's purse, a small flashlight, and a jewelry box he had taken from the Reid house onto the roof of the doctor's office.
Almost a month later, on April 27, 1987, the Jackson Police Department received a call from Bailey Avenue concerning a possible house burglary. Several officers responded to the call, which resulted in the arrest of Gregory Davis and his younger brother, Thomas, in the parking lot of the Jackson Mall. Davis was first taken by Officer Shirley Williams to the Bailey Avenue complainant's home, where a positive identification was made. After the identification Davis was placed under arrest and taken to Precinct Three in the Jackson Mall. Davis was read his Miranda rights, waived them, and was questioned for a brief time about the house burglary. After indicating that he wished to remain silent, the questioning ended. He was then transported downtown to the city jail.
The next day, April 28, 1987, Detective Charles Crisco noticed that Gregory Davis had been arrested for the house burglary on Bailey Avenue. There had been numerous similar incidents in that general area and Crisco thought these incidents might be related to the Reid murder. Along with his partner, Detective Robert Jordan, Crisco took Davis into one of the interrogation rooms on the third floor of the police department and began to question him at about 1:30 p.m. Before the questioning, Davis was once again read his Miranda rights and waived them in writing. After some preliminary questioning concerning the Bailey Avenue incident and other burglaries, Crisco began to question Davis about the Reid murder. After initially denying any involvement, Davis admitted that he had killed Mrs. Reid. The police recorded Davis' statement, had a transcript made of the statement, and also had a policeman take a typed statement. During the interrogation, the officers took Davis over to the doctor's office on Manship Street, where they found the pink purse, the flashlight, and the jewelry box on the roof of the office.
Gregory Davis' trial began on January 13, 1988. Davis did not testify in his behalf, but offered the defense of insanity. Conflicting psychological and psychiatric testimony was presented. When the State attempted to introduce certain photographs into evidence, defense counsel objected, saying that the pictures were gruesome, *168 repetitive, and that prejudice resulting from their introduction would far outweigh any probative value the pictures might have. The trial court allowed some of the pictures in, and excluded others, including certain post-autopsy photographs. The State also introduced Davis' confession into evidence over defense counsel's objection.
After deliberating for thirty-five minutes, the jury found Gregory Davis guilty of capital murder. The jury then proceeded to sentence Davis to death. Davis appeals, assigning the following as errors.

I. DID THE LOWER COURT ERR IN ADMITTING INTO EVIDENCE GREGORY DAVIS' CONFESSION?
Before trial Gregory Davis filed a motion to suppress his confession, alleging that it was made as a result of coercion and in violation of his constitutional rights. A hearing was held pursuant to this motion on December 21-22, 1987. The first witness at the suppression hearing was Detective Charles Crisco. Crisco testified that Davis never at any time before questioning began on April 28, 1987, requested to speak to an attorney. Crisco denied that Davis had been denied food on the day of the interrogation, and also denied that Davis had been threatened if he would not confess and promised help if he would.
Gregory Davis testified next. According to Davis, after he was taken from Precinct Three downtown to the city jail, he was not allowed to make a phone call. He was fed on the morning of April 28, and was given nothing else to eat until that night, after he had confessed. Davis said that Crisco and Jordan began interrogating him at noon, and the interrogation consisted of threats and promises of help if he would confess. Davis alleged that at one point Crisco threatened to have him electrocuted if he would not confess. Davis maintained that at this point, he first asked to speak to a lawyer. He said that Crisco told him that he could speak to a lawyer if he would sign the form waiving his Miranda rights. Davis signed the form, but still was not allowed to make a phone call or see an attorney. According to Davis, Crisco also promised him help from a judge if he would confess. Davis never testified that he asked to speak to a lawyer when he was first arrested at Precinct Three on April 27, 1987.
Dr. Charlton Stanley, a psychologist, and Dr. Timothy Summers, a psychiatrist, both evaluated Davis for the defense. Both found that Davis was paranoid schizophrenic and that under the interrogation conditions that Davis had alleged, his confession would have been the result of impaired judgment and involuntary. Stanley testified that under the conditions that Detective Crisco had sworn to, his opinion would be different. Summers testified that even under optimum conditions, if Davis was surrounded by authority figures, such as police, his confession would be involuntary.
Dr. Rodrigo Galvez and Dr. Michael Whelan testified for the State. Both found that Gregory Davis had a personality disorder, but neither felt that he was paranoid schizophrenic. Both felt that he was competent to knowingly, intelligently, and voluntarily waive his rights.
Sergeant Cleon Butler, who was assigned to Burglary Division in April, 1987, was at Precinct Three on April 27 when Davis was arrested. Butler stated that he questioned Davis about the burglary for about five minutes, and then Davis told him that he didn't want to talk about the burglary any more, and that he wanted an attorney present. At that time, Butler said that Davis was transported to the city jail. On cross-examination defense counsel attempted to have Butler elaborate on this request for an attorney, but Butler's response was confusing and contradictory. The trial court felt the need finally to question Butler on its own, and Butler repeated his statement that Davis had asked for an attorney at Precinct Three on April 27.
After Butler's testimony, four other police officers who were at Precinct Three on April 27 after Davis' arrest were called. None of them recalled Davis asking for an attorney, and some who claimed to be with Davis during the entirety of his stay at Precinct Three stated affirmatively that he *169 did not ask for an attorney at any time. Detectives Crisco and Jordan were recalled, and both said that they had spoken to Sergeant Butler after Davis' arrest. Both agreed that Butler had said nothing about Davis requesting an attorney.
The trial court issued its opinion on January 4, 1988. It made the following findings of fact:
1) that Gregory Davis "did not exercise his right to an attorney through Sergeant Butler and that Sergeant Butler's testimony is the result of an honest mistake;"
2) that Gregory Davis "terminated the interview at Precinct 3 with a statement that he did not desire to discuss the burglary further;"[1]
3) that Gregory Davis "had the capacity to and did understand his rights as set out in the Miranda decision; that he was fully advised of those rights and that he freely, voluntarily and intelligently waived those rights."
Findings by a trial judge that a defendant confessed voluntarily, and that such confession is admissible are findings of fact. Such findings are treated as findings of fact made by a trial judge sitting without a jury as in any other context. As long as the trial judge applies the correct legal standards, his decision will not be reversed on appeal unless it is manifestly in error, or is contrary to the overwhelming weight of the evidence. Frost v. State, 483 So.2d 1345, 1350 (Miss. 1986); White v. State, 495 So.2d 1346, 1347 (Miss. 1986). The trial judge determines, in view of the totality of the circumstances, whether or not a confession was made voluntarily, and whether there was a knowing and voluntary waiver of the accused's privilege against self-incrimination. Jones v. State, 461 So.2d 686, 696 (Miss. 1984); Gavin v. State, 473 So.2d 952, 954 (Miss. 1985). The State has the burden of proving all facts prerequisite to admissibility beyond a reasonable doubt. Jones, 461 So.2d at 697; Gavin, 473 So.2d at 954.
We find that the trial judge's findings of fact were not against the overwhelming weight of the evidence and were not manifestly in error. Sergeant Butler, who played a minor role in the jailhouse scenario, was the only officer who stated that he heard Davis ask for a lawyer at Precinct Three, and his testimony is confusing and shallow. Gregory Davis never testified that he asked for a lawyer at Precinct Three. Davis' own testimony first mentions a lawyer, according to the record, at the time that he mentions the alleged electrocution threat by Detective Crisco on the afternoon of April 28th. As to the alleged threats and coercive tactics used by Crisco and Jordan during their interrogation of Davis, it should be noted that Davis told at least two different versions of this session, that his own doctors testified that he was happy in jail and when he was causing his parents difficulty, and that none of the threats showed up on any of the tapes made of the session. Crisco and Jordan admitted that they lied to Davis concerning the evidence in their possession. Although this is a factor to be considered when reviewing the voluntariness of the confession, it should be viewed in the "totality of the circumstances." Frazier v. Cupp, 394 U.S. 731, 739, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969); State v. Strauch, 239 Kan. 203, 718 P.2d 613, 623 (1986). This assignment of error is without merit.

II. WAS THE DEFENDANT DENIED EQUAL PROTECTION BY THE USE OF PEREMPTORY CHALLENGES BY THE STATE?
Gregory Davis is black. He argues on appeal that the State used its peremptory challenges in an unconstitutional manner to exclude potential black jurors from the jury. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The jury which was eventually seated to try *170 Davis was composed of four men and eight women, all white. The State exercised twelve peremptory challenges, seven of which were used to exclude black persons from the jury.
Batson requires a defendant, in order to make out a prima facie case of purposeful discrimination in the selection of a petit jury, to establish:
(1) that he is a member of a cognizable racial group;
(2) that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race;
(3) that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.
Batson, 476 U.S. at 96, 106 S.Ct. at 1723; see also Taylor v. State, 524 So.2d 565, 566 (Miss. 1988).
Once this prima facie showing has been made,
the burden shifts to the State to come forward with a neutral explanation for challenging black jurors. Though this requirement imposes a limitation in some cases on the full peremptory character of the historic challenge, we emphasize that the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause. But the prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption  or his intuitive judgment  that they would be partial to defendant because of their shared race... . Nor may the prosecutor rebut the defendant's case merely by denying that he had a discriminatory motive or "affirm[ing] [his] good faith in making individual selections." ... The prosecutor therefore must articulate a neutral explanation related to the particular case to be tried. The trial court then will have the duty to determine if the defendant has established purposeful discrimination.
Batson, 476 U.S. at 97-98, 106 S.Ct. at 1723-24 (citations omitted).
In the case at bar counsel for Davis objected after each potential black juror was struck. The trial judge found that there was no pattern of elimination of black jurors, as the State had also excused five potential white jurors through peremptory challenges. "Out of an abundance of caution because this [was] a capital murder case," the trial judge required the State to justify the challenges. The State complied as follows:
(1) Object to Mary Duncan based upon the fact that all parties, including the Court, have stated that the trial will last in excess of a week and she's an elderly black female  just she's an elderly person who is  was born in 1916  April of 1916 and also she lists that her organizations to which she belongs, fraternal service, charitable, et cetera, are the choir, the deacon  the choir deacon, a minister's wife and the Mission Sunday School. She says that her favorite reading material is the Hattiesburg American, her Bible and the Reader's Digest. She says that her husband is Reverend McKinley Duncan, has been a minister and pastor and that they've been married for fifty-seven years.
(2) Hazel Bournes the State challenges because she stated on her form she was against the death penalty. It was quite evident that for some reason that she never gave and which we were never able to determine that she suddenly changed her mind once she realized what was happening, that is, we were letting jurors off who were against the death penalty and overnight, she suddenly became in favor of the death penalty. And we object because of her vacillation and because she originally  her first impression was that she was against the death penalty.
(3) We object to Earnest Conerly based on the same reason that we gave; that is, suddenly Earnest Conerly, when he realized that this was a death penalty case and might be excused from the jury for being opposed to the death penalty changed his original impression that he wrote on his jury information questionnaire *171 when asked, "What is his opinion of the death penalty?" "I don't believe in the death penalty." Suddenly, without any explanation changed his mind overnight and said, "Oh, yes, he could vote for the death penalty." In addition to that, he said that he could not properly read and write and had to have a friend help in filling out the form and there will be a request by the State that the jury be allowed to read along a transcript of a tape that is a vital portion of the State's case and in addition to that, the juror said he couldn't properly serve in this case due to his inability to read and write.
(4) My first note that I wrote when I saw Hollis Hall walk into the courtroom was "sullen" and I never changed it  I never changed my opinion from the date that I saw her first until she last left this courtroom. Every question I asked her she answered in a hostile manner. She gave no opinion when asked what her opinion of the death penalty was and for that reason, the State had to request an individual voir dire of her and it was obvious to the State that she was hostile during that individual voir dire... . And we also object on the fact that she is a divorced single parent.
(5) Object to Johnnie Horne based upon the fact  excuse me. There's one thing I left out. On Earnest Conerly, I'd like to further state another reason we object to him is that he stated that he chat  he talked with Johnnie Horne outside the presence of the court with regard to matters that were going on in the courtroom. For the same reason, we object to Johnnie Horne because he stated he talked outside the court regarding matters that went on inside of the court and we previously voluntarily admitted that that was grounds for a juror to be excused and excused a white female who said she was in favor of the death penalty. In addition to that, Johnnie Horne has a first cousin on parole now who was charged with killing someone and received a life sentence. In addition to that, Mr. Binder stated in front of the juror that like the record to reflect that he's black and that we'd called him in here because of his race and he could be prejudiced against the State based on that. In addition to that, when questioned about the death penalty, he stated he possibly could vote for the death penalty, but if he did, he would suffer from remorse and he refused to fill out the form when asked what is his opinion of the death penalty. In addition to that, he belongs to no social, fraternal service or charitable organizations. He is single. That is all.
(6) In all deference to the Court, Bernice McNair stated unequivocally that she could never vote for the death penalty if the Defendant has a mental problem. I have on my notes that she stated that she was not in favor of the death penalty, although she has said that that wasn't true.
(7) Object to Geneva Hopkins based upon the fact that she sat upon a  that she sat on a jury on June of 1887 [sic] on a child molesting case, which involved a sexual misconduct which resulted in a mistrial. She lists no social, fraternal service or charitable organizations other than mission.
The trial judge found that the reasons enumerated by the State were acceptable. Such findings are entitled to "great deference" from a reviewing court. Batson, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21. This Court has adopted the "clearly erroneous/overwhelming weight of the evidence" standard when reviewing such findings. Lockett v. State, 517 So.2d 1346, 1350 (Miss. 1987).
Considering this standard of review, and after careful scrutiny of the record, we find that the trial judge's findings are not clearly erroneous. The reasons supplied by the State are "neutral", "related to the particular case tried", and supported by the record. While these peremptory challenges may not have sufficed as challenges for cause, Batson clearly states that they are not required to rise to that level. The challenges presented by the State here are well within the parameters of the Batson guidelines as interpreted by this Court. See Lockett v. State, 517 So.2d 1346 (Miss. *172 1987) (list of non-race based reasons found acceptable by other courts); Chisolm v. State, 529 So.2d 635, 639 (Miss. 1988) (Batson "in no way precludes exercise of a peremptory challenge for a non-race based reason that objective and fair-minded persons might regard as absurd").
Davis also argues that the State challenged black veniremen for reasons applicable but not used against white veniremen, and the record reflects that this is accurate (Mary Duncan was challenged in part because she was a preacher's wife, but a white minister was not challenged; Johnnie Horne and Earnest Conerly were challenged in part because they discussed the case during voir dire, while white veniremen who also discussed the case were not challenged). While such use of challenges is a factor that may be considered by the trial court, in this case there were other reasons given which were adequate under Batson besides these disputed ones.
Davis further argues that he was not allowed to rebut the reasons for the peremptory challenges supplied by the State, and if he had been allowed to do so, he could have shown that the reasons were not well-founded and had a discriminatory purpose. After the first two blacks were struck by the State, counsel for Davis asked the trial court to require the State to justify the strikes. The trial court required the State to put forward its neutral explanations. After the State had finished, counsel for Davis asked to "make a record on this." The trial court replied, "Well, what record to you want to make? It's what the prosecutor considers their reasons." Defense counsel alleged that the reasons were inadequate under Batson. The trial court replied, "If the  if there is a conviction, it will probably be reviewed."
It is clear from the record that counsel for Davis was given his opportunity to "make his record". He could have made an offer of proof after the neutral reasons were supplied by the State, but instead only alleged in general terms that the strikes exercised by the State amounted to a Batson violation. The defense may rebut the neutral nonracial explanation for peremptory challenges, see Joseph v. State, 516 So.2d 505 (Miss. 1987); Johnson v. State, 529 So.2d 577, 584 (Miss. 1988); Taylor v. State, 524 So.2d 565, 566 (Miss. 1988); Abram v. State, 523 So.2d 1018, 1019 (Miss. 1988); Dedeaux v. State, 519 So.2d 886, 891 (Miss. 1988); Harper v. State, 510 So.2d 530, 532 (Miss. 1987); Williams v. State, 507 So.2d 50, 53 (Miss. 1987), but in the instant case the defense offered no such rebuttal. In the absence of an actual proffer of evidence concerning this issue, this Court may not reverse on this point. See Jones v. State, 306 So.2d 57, 58 (Miss. 1975); Pennington v. State, 437 So.2d 37, 39 (Miss. 1983). While this Court intends to be sensitive to the possibility that reasons given for challenging prospective jurors may actually be for racially discriminatory purposes, it is incumbent upon Davis to come forward with proof when given the opportunity for rebuttal. In the case sub judice there was a weak suggestion of rebuttal and a stated desire to be heard in rebuttal, but there was no proffer of evidence, no words of rebuttal. Chisolm v. State, 529 So.2d 635, 639 (Miss. 1988). The Batson Court specifically declined to formulate a procedure to be followed by trial courts in dealing with this question. Considering that later federal cases have declined to issue "per se rules" to be followed when a Batson challenge arises, see United States v. Davis, 809 F.2d 1194, 1201 (6th Cir.1987); United States v. Tindle, 860 F.2d 125, 130-131 (4th Cir.1988), and considering that the procedure followed by the trial court in the case at bar has been previously allowed by this Court, see Johnson v. State, 529 So.2d 577 (Miss. 1988); Chisolm v. State, 529 So.2d 635 (Miss. 1988), we find that there was no error here, either in the trial court's findings or in the procedure followed.

III. DID THE ADMISSION OF CERTAIN PHOTOGRAPHS DENY GREGORY DAVIS HIS DUE PROCESS RIGHT TO A FAIR TRIAL?
Davis argues that certain photographs of the deceased introduced by the State were so gruesome and prejudicial that they in part resulted in the failure of Davis to *173 receive a fair trial. Defense counsel made a contemporaneous objection at the introduction of each photograph.
The admission of photographs into evidence is within the discretion of the trial judge, and such admission will be upheld on appeal absent a showing of an abuse of that discretion. Jackson v. State, 527 So.2d 654, 657 (Miss. 1988); Alford v. State, 508 So.2d 1039, 1041 (Miss. 1987). If photographs are relevant, the mere fact that they are unpleasant or gruesome is no bar to their admission in evidence. Boyd v. State, 523 So.2d 1037, 1040 (Miss. 1988). However, photographs of the victim should not ordinarily be admitted into evidence where the killing is not contradicted or denied, and the corpus delecti and the identity of the deceased have been established. Shearer v. State, 423 So.2d 824, 827 (Miss. 1982); Sharp v. State, 446 So.2d 1008, 1009 (Miss. 1984). Photographs of bodies may be admitted into evidence in criminal cases where they have probative value and where they are not so gruesome or used in such a way as to be overly prejudicial or inflammatory. Griffin v. State, 504 So.2d 186, 191 (Miss. 1987); Miss.R.Evid. 403.
In the case at bar the defense admitted that Davis had killed Mrs. Reid, so there was no need to establish the identity of the killer or victim. It appears that the exhibits have some probative value, and although they are extremely unpleasant, they do not appear to be as gruesome as some photographs described in other cases. Exhibits 18 and 19 are repetitive of Exhibit 1. The trial judge did sustain defense counsel's objection to certain post-autopsy photographs which the State tried to introduce. Also, once the photographs were in evidence, counsel for Davis used them to elicit reactions from Davis' parents on direct examination. This assignment of error is denied.

IV. WAS THE VERDICT OF GUILTY AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE?
Gregory Davis maintains that the finding by the jury that he was M'Naghten sane at the time he murdered Addie Reid is against the overwhelming weight of the evidence. Dr. Charlton Stanley, a psychologist, and Dr. Timothy Summers, a psychiatrist, testified for Davis. Stanley found that Davis was paranoid schizophrenic. Summers found that Davis suffered from a borderline character disorder, seizure disorders, and had a schizophrenic-like psychosis. Indeed Dr. Stanley in a written report found Davis to be M'Naghten sane and held such a belief until one hour before he testified. Only then did he testify that he finally concluded that Davis was M'Naghten insane. Both found that Davis was M'Naghten insane at the time of the murder.
Dr. Michael Whelan, a psychologist, and Dr. Rodrigo Galvez, a psychiatrist, testified for the State. Both testified that Davis has a personality disorder. Dr. Whelan added that Davis showed avoidant, dependent, and passive-aggressive tendencies, but Davis was not psychotic. Both found that Davis was not M'Naghten insane.
This jurisdiction continues to follow the M'Naghten rule on insanity. The rule has been stated as follows:
To establish a defense on the ground of insanity, it must be clearly proved that at the time of committing of the act the accused was laboring under such defect of reason from disease of the mind as (1) not to know the nature and quality of the act he was doing, or (2) if he did know it, that he did not know that what he was doing was wrong.
Hunter v. State, 489 So.2d 1086, 1090 (Miss. 1986); Laney v. State, 486 So.2d 1242, 1245 (Miss. 1986). The defendant is presumed sane until a reasonable doubt of his sanity is created. When such a doubt arises, the burden is then placed upon the State to prove, beyond a reasonable doubt, the defendant's sanity. Billiot v. State, 454 So.2d 445, 463 (Miss. 1984). The issue of a defendant's insanity is a determination for the jury to make, and the finding will not be reversed if it is supported by substantial evidence. Yarbrough v. State, 528 So.2d 1130 (Miss. 1988); Gerlach v. State, *174 466 So.2d 75, 79 (Miss. 1985). In making this determination the jury may accept or reject expert and lay testimony. Gill v. State, 488 So.2d 801, 802 (Miss. 1986); Brady v. State, 425 So.2d 1347, 1349 (Miss. 1983). A finding that one is mentally ill does not necessarily mean that one is M'Naghten insane. Gerlach, 466 So.2d at 79; Hunter, 489 So.2d at 1090.
In this case the jury had an opportunity to judge the credibility of both sides' experts. The jury obviously found that the State's experts were more credible, and such a finding is supported by the record. The jury's determination was not against the overwhelming weight of the evidence, and this assignment of error is without merit. Finding no reversible error here, as with the preceding assignments of error, we affirm both the conviction of capital murder and the sentence of death.
CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH AFFIRMED. WEDNESDAY, SEPTEMBER 20, 1989, SET AS DATE FOR EXECUTION OF SENTENCE IN THE MANNER PROVIDED BY LAW.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON and BLASS, JJ., concur.
ROBERTSON and SULLIVAN, JJ., concur with separate written opinions.

APPENDIX

DEATH CASES AFFIRMED BY THIS COURT
Pinkney v. State, 538 So.2d 329 (Miss. 1989).
Clemons v. State, 535 So.2d 1354 (Miss. 1988).
Woodward v. State, 533 So.2d 418 (Miss. 1988).
Nixon v. State, 533 So.2d 1078 (Miss. 1987).
Williams v. State, 544 So.2d 782 (Miss. 1987).
Cole v. State, 525 So.2d 365 (Miss. 1987).
Lockett v. State, 517 So.2d 1346 (Miss. 1987).
Lockett v. State, 517 So.2d 1317 (Miss. 1987).
Faraga v. State, 514 So.2d 295 (Miss. 1987).
Jones v. State, 517 So.2d 1295 (Miss. 1987).
Wiley v. State, 484 So.2d 339 (Miss. 1986).
Johnson v. State, 477 So.2d 196 (Miss. 1985).
Gray v. State, 472 So.2d 409 (Miss. 1985).
Cabello v. State, 471 So.2d 332 (Miss. 1985).
Jordan v. State, 464 So.2d 475 (Miss. 1985).
Wilcher v. State, 455 So.2d 727 (Miss. 1984).
Billiot v. State, 454 So.2d 445 (Miss. 1984).
Stringer v. State, 454 So.2d 468 (Miss. 1984).
Dufour v. State, 453 So.2d 337 (Miss. 1984).
Neal v. State, 451 So.2d 743 (Miss. 1984).
Booker v. State, 449 So.2d 209 (Miss. 1984).
Wilcher v. State, 448 So.2d 927 (Miss. 1984).
Caldwell v. State, 443 So.2d 806 (Miss. 1983).
Irving v. State, 441 So.2d 846 (Miss. 1983).
Tokman v. State, 435 So.2d 664 (Miss. 1983).
Leatherwood v. State, 435 So.2d 645 (Miss. 1983).
Hill v. State, 432 So.2d 427 (Miss. 1983).
Pruett v. State, 431 So.2d 1101 (Miss. 1983).
Gilliard v. State, 428 So.2d 576 (Miss. 1983).
Evans v. State, 422 So.2d 737 (Miss. 1982).
King v. State, 421 So.2d 1009 (Miss. 1982).
*175 Wheat v. State, 420 So.2d 229 (Miss. 1982).
Smith v. State, 419 So.2d 563 (Miss. 1982).
Johnson v. State, 416 So.2d 383 (Miss. 1982).
Edwards v. State, 413 So.2d 1007 (Miss. 1982).
Bullock v. State, 391 So.2d 601 (Miss. 1980).
Reddix v. State, 381 So.2d 999 (Miss. 1980).
Jones v. State, 381 So.2d 983 (Miss. 1980).
Culberson v. State, 379 So.2d 499 (Miss. 1979).
Gray v. State, 375 So.2d 994 (Miss. 1979).
Jordan v. State, 365 So.2d 1198 (Miss. 1978).
Voyles v. State, 362 So.2d 1236 (Miss. 1978).
Irving v. State, 361 So.2d 1360 (Miss. 1978).
Washington v. State, 361 So.2d 61 (Miss. 1978).
Bell v. State, 360 So.2d 1206 (Miss. 1978).

DEATH CASES REVERSED AS TO GUILT PHASE AND SENTENCE PHASE
Leatherwood v. State, 548 So.2d 389 (Miss. 1989).
Mease v. State, 539 So.2d 1324 (Miss. 1989).
Houston v. State, 531 So.2d 598 (Miss. 1988).
West v. State, 519 So.2d 418 (Miss. 1988).
Davis v. State, 512 So.2d 1291 (Miss. 1987).
Williamson v. State, 512 So.2d 868 (Miss. 1987).
Foster v. State, 508 So.2d 1111 (Miss. 1987).
Smith v. State, 499 So.2d 750 (Miss. 1986).
West v. State, 485 So.2d 681 (Miss. 1985).
Fisher v. State, 481 So.2d 203 (Miss. 1985).
Johnson v. State, 476 So.2d 1195 (Miss. 1985).

DEATH CASES REVERSED AS TO GUILT PHASE AND SENTENCE PHASE
Fuselier v. State, 468 So.2d 45 (Miss. 1985).
West v. State, 463 So.2d 1048 (Miss. 1985).
Jones v. State, 461 So.2d 686 (Miss. 1984).
Moffett v. State, 456 So.2d 714 (Miss. 1984).
Lanier v. State, 450 So.2d 69 (Miss. 1984).
Laney v. State, 421 So.2d 1216 (Miss. 1982).

DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR RESENTENCING TO LIFE IMPRISONMENT
Reddix v. State, 547 So.2d 792 (Miss. 1989).
Wheeler v. State, 536 So.2d 1341 (Miss. 1988).
White v. State, 532 So.2d 1207 (Miss. 1988).
Bullock v. State, 525 So.2d 764 (Miss. 1987).
Edwards v. State, 441 So.2d 84 (Miss. 1983).
Dycus v. State, 440 So.2d 246 (Miss. 1983).
Coleman v. State, 378 So.2d 640 (Miss. 1979).

DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR A NEW TRIAL ON SENTENCING PHASE ONLY
Johnson v. State, 547 So.2d 59 (Miss. 1989).
Williams v. State, 544 So.2d 782 (Miss. 1989).
Lanier v. State, 533 So.2d 473 (Miss. 1988).
*176 Stringer v. State, 500 So.2d 928 (Miss. 1986).
Pinkton v. State, 481 So.2d 306 (Miss. 1985).
Mhoon v. State, 464 So.2d 77 (Miss. 1985).
Cannaday v. State, 455 So.2d 713 (Miss. 1984).
Wiley v. State, 449 So.2d 756 (Miss. 1984).
Williams v. State, 445 So.2d 798 (Miss. 1984).

DEATH CASES REMANDED
Leatherwood v. State, 539 So.2d 1378 (Miss. 1989).
Abram v. State, 523 So.2d 1018 (Miss. 1988).
ROBERTSON, Justice, concurring:
What has happened in this case is fundamentally morally wrong. A black man, charged with the capital murder and sexual brutalization of an elderly and apparently defenseless white woman, has been put on trial for his life before an all white jury, a jury seated after the prosecutor was allowed peremptorily to strike all seven black potential jurors. And it was so unnecessary. On this evidence a jury of twelve cerebral eunuchs would have convicted.
Still, I can but affirm. The enforceable positive law, as I understand it, permits what the record reflects has occurred. Though I have no doubt much of our law has its moorings in notions of political morality, e.g., Pharr v. State, 465 So.2d 294, 297 (Miss. 1984), I have always thought it a virtue that the judicial mind keep before it the proper distinctions between law and morality and enforce the latter only insofar as it may be reflected in the former. See Frazier v. State By and Through Pittman, 504 So.2d 675, 714-15 n. 7 (Miss. 1987); Hart, The Concept of Law, 181-207 (1961); Holmes, The Path of the Law, 10 Harv.L.Rev. 457-464 (1897).
There was once hope, and but recently. When the sun set on April 30, 1986, the Supreme Court had declared unlawful purposeful use of peremptory challenges to exclude black persons from jury service. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). It is true that Batson paints with a broad brush. From the clear view hindsight so often provides, our law job was to hang flesh upon Batson's skeletal frame; to be sure, to fit it within the fabric of our law of criminal procedure but to do so in a way that both fits the Batson text and justifies Batson as a political and moral judgment legislated by a superior and authoritative law maker, Williams v. State, 507 So.2d 50, 53 (Miss. 1987); Thomas v. State, 517 So.2d 1285, 1293 (Miss. 1987) (Robertson, J., dissenting), a judgment founded upon the realities that substantial and invidious racial discrimination was being practiced in jury selection, that this was a state-sponsored sin, and that two decades' experience had shown Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) an inept antidote. If anything is clear, it is that Batson was meant to change things, not just form but substance. The American federal judicial system works only to the extent its fifty partners in the main accept with good cheer the Supremacy Clause's so easily evaded mandate.
I would have thought Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) a clarion call that "We really mean it!" Yet history records that Batson's effect was quickly eviscerated.[1] Except a prosecutor dimwittedly confess his discriminatory purpose, Goggins v. State, 529 So.2d 649, 651-52 (Miss. 1988), or offer no reason at all in support of his strike, Conerly v. State, 544 So.2d 1370, 1372 (Miss. 1989), he may with impugnity exclude black jurors to the limit of his peremptory challenges. Our positive post-Batson law, as I perceive it, accepts that any pretext will pass for a racially neutral reason for exclusion. See Wheeler v. *177 State, 536 So.2d 1347, 1351 (Miss. 1988); Chisolm v. State, 529 So.2d 630, 632-33 (Miss. 1988); Johnson v. State, 529 So.2d 577, 582-85 (Miss. 1988); Lockett v. State, 517 So.2d 1346, 1356-57 (Miss. 1987). We have held that Batson "in no way precludes exercise of a peremptory instruction challenge for a non-race based reason that objective and fair minded persons might regard as absurd," Chisolm v. State, 529 So.2d 635, 639 (Miss. 1988), an utterance for which I bear no small burden. Our law has unleashed and exalted the Batson-recognized
fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate.
Batson, 476 U.S. at 96, 106 S.Ct. at 1723. In sum, I see no principled basis upon which we may here reverse without violence to our en gross post-Batson pronunciamentos.[2] And some federal courts are even worse. E.g., United States v. Davis, 809 F.2d 1194, 1202 (6th Cir.1987).
But a step back from our legal blinders and into the world of common sense reveals a different picture. The pretense that the prosecutor had in mind racially neutral reasons for striking each and every one of these seven black potential jurors may but call to mind "the eerie atmosphere of never-never land" in which a former Attorney General of this state once urged, and a U.S. District Court once found, that Mississippi had no official policy of racial segregation.[3]Meredith v. Fair, 298 F.2d 696, 701 (5th Cir.1962). Little beyond common sense is required to perceive the virtually non-existent statistical probability that the prosecuting attorney below in fact exercised the seven peremptory challenges at issue for neutral, non-race based reasons, a point I have offered before without effect. Lockett v. State, 517 So.2d 1346, 1358-59 (Miss. 1987) (Robertson, J., dissenting). Enforcement of Batson's paper right has simply not been forthcoming. I can but think of Holmes' utterance from another context "Legal obligations that exist but cannot be enforced are ghosts that are seen in the law but that are elusive to the grasp." The Western Maid, 257 U.S. 419, 433, 42 S.Ct. 159, 161, 66 L.Ed. 299, 302 (1922); see also Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319, 321 (1920).
Because the day is late and we are bound by our post-Batson precedents, I see no choice but to do expressly what the majority does implicitly: pass the buck from whence it came, to the Supreme Court of the United States, with a plea that Batson be overruled or given teeth.
SULLIVAN, Justice, concurring:
First, I concur in the opinion of the majority and with much of what is said in the concurring opinion of Robertson, J.
I write separately because in my view our short history of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 *178 (1986), convinces me that Justice Marshall's concurring opinion in the case was the correct approach to the abuse of peremptory instruction.
I know of no valid reason why a citizen of this State should be removed from a jury without any cause being given simply because one side or the other did not want that citizen to sit on the jury.
It appears to me that the most open and honorable solution to the problem is to do away with peremptory challenges in criminal cases both for the prosecution and for the defense, and allow a juror to be challenged only for good cause shown.
Therefore, I would affirm the conviction and sentence in this case and declare an end to all peremptory challenges in all criminal cases tried in the courts in the State of Mississippi from this day forward.
NOTES
[1] Although it was raised as an issue by neither side, whether Gregory Davis' invocation of his right to remain silent should have had any effect on the admissibility of his confession has been considered by this Court. We find that Davis' right was "scrupulously honored", as mandated by Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).
[1] Apart from the problem of today's case, we indefensibly held defendants to procedural burdens from which prosecutors were exempted. Contrast Williams v. State, 507 So.2d 50 (Miss. 1987) from Thomas v. State, 517 So.2d 1285 (Miss. 1987) and Jones v. State, 517 So.2d 1295 (Miss. 1987); see particularly my dissenting opinion in Thomas, 517 So.2d at 1288-95.
[2] One point of Batson procedure has been saved and I applaud the majority for recognizing it. Our cases do say, once the prosecutor has tendered his reasons for challenge, the defense may rebut, Chisolm v. State, 529 So.2d 635, 638 (Miss. 1988); Johnson v. State, 529 So.2d 577, 584 (Miss. 1988); Taylor v. State, 524 So.2d 565, 566 (Miss. 1988); Abram v. State, 523 So.2d 1018, 1019 (Miss. 1988); Dedeaux v. State, 519 So.2d 886, 891 (Miss. 1988); Joseph v. State, 516 So.2d 505 (Miss. 1987); Harper v. State, 510 So.2d 530, 532 (Miss. 1987); Williams v. State, 507 So.2d 50, 53 (Miss. 1987). Nothing in Batson or our cases precludes the defense from attempting to show the prosecutor's reasons as false or sham. The point, however, avails Davis nothing on this record. After the prosecution gave its "neutral explanations", counsel for Davis asked to "make a record on this." The trial judge replied, "Well, what record do you want to make? It's what the prosecutor considers their reasons." Defense counsel alleged that the reasons were inadequate under Batson. It appears quite clear the Circuit Court misapprehended this point of Batson procedure, and had Davis tendered us a record that even halfway suggested he had a meaningful rebuttal to make and was denied same, I would reverse. If Davis had tendered a rebuttal, the Court would have been obligated to hear it. Davis' record is deficient and no reason appears why we ought exempt him from the rule. Rule 103(a)(2), Miss.R.Ev. Again the forms require affirmance.
[3] Compare Edwards v. Thigpen, 682 F. Supp. 1374, 1379-80 (S.D.Miss. 1987) (discussion of jury selection practices of Hinds County District Attorney's Office).